Mazin A. Sbaiti, Esq.
Cali. Bar No. 275089
MAS@SbaitiLaw.com
SBAITI & COMPANY PLLC
2200 Ross Ave.
Suite 4900W
Dallas, TX  75201
T:  (214) 432-2899
F:  (214) 853-4367
*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMANCHE PEAK POWER COMPANY LLC,<br><br>*Plaintiff,*<br><br>vs.<br><br>QUASAR RESOURCES PTY LTD,<br><br>*Defendant.* | CASE NO. '20CV1731 GPC LL<br><br>**ORIGINAL COMPLAINT**<br><br>Demand for Jury Trial |

# I.

# **NATURE OF THE ACTION**

1.  This is an action to vindicate the rights of Plaintiff Comanche Peak Power Company LLC ("Plaintiff" or "Comanche Peak") against Quasar Resources Pty Ltd ("Quasar" or "Defendant") for damages.

2.  In short, Comanche Peak is a nuclear energy facility. As part of its business, it must enter into contracts to purchase uranium, a commodity, which is enriched and then used in the energy generating process. It serves over a million households.

3.  Comanche Peak entered into a written third-party brokered Uranium Confirm agreement to purchase 100,000 pounds of uranium from Quasar at $23.15 per pound ("Brokered Transaction"). Comanche Peak and Quasar discussed and agreed that in the interests of long-term business, they would put their energies into a broader master sales agreement, which would ostensibly cover the Brokered Transaction and any future ones.

4.  Neither party evinced any intent or purpose that they would abandon the Brokered Transaction already agreed upon if a broad master agreement could not be reached, or not simply revert to a simple spot agreement and complete the Brokered Transaction.

5.  During the negotiations over the master sales agreement, the price of uranium fell to the point that it would have been in Comanche Peak's interest to abandon the deal. But it did not do so because it relied upon conversations with Quasar wherein both parties represented that they had a firm deal for the uranium purchase under the Brokered Transaction.

6.  When it appeared that the parties were inches from a final master sales agreement—which coincided with a change in the price of uranium that was unfavorable to the Defendant—Defendant verbally attempted to repudiate the entire

transaction; and meanwhile, Plaintiff had agreed to and executed the proposed Master Service Agreement.

7. Plaintiff, thus, brings this suit for damages.

## II.

## THE PARTIES

8. Plaintiff Comanche Peak is a Delaware limited liability company with its principal place of business in the State of Texas, and its sole member is Vistra Preferred Inc., a Delaware corporation, with its principal place of business in the State of Texas—thus, Comanche Peak is a citizen of the State of Delaware and the State of Texas.

9. Defendant Quasar Resources Pty Ltd. is an Australian corporation with its principal place of business at Se 2 L 7 Grenfell Street, Adelaide, Australia. Its U.S. headquarters are at 3550 General Atomics Court, San Diego, California 92121. It may be served at its place of business or on the California Secretary of State.

## III.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 (diversity jurisdiction). Because the Plaintiff is a citizen of a different state than Defendant's citizenship, complete diversity thus exists, and the value of the dispute or amount in controversy exceeds $75,000, diversity jurisdiction is met here.

11. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial number of the acts or omissions giving rise to the claims hereof occurred in this District.

12. General personal jurisdiction over the Defendant is proper because Defendant has purposefully availed itself of the State of California, the California market, California businesses, and the California laws by maintaining its U.S. headquarters in California and thus availing itself of the protection of the laws of

California. Specific jurisdiction exists here because a substantial portion of the acts or omissions giving rise to the action occurred in California.

## IV.
## FACTUAL BACKGROUND

13.  Plaintiff Comanche Peak is a nuclear-powered electrical generation plant that supplies power and electricity to end users across the United States.

14.  Defendant Quasar is an Australia-based mineral exploration company that mines and sells, among other minerals, Triuranium Octoxide ("$\underline{U_3O_8}$"), a compound of uranium that is used in the nuclear fuel cycle to provide the power source for Comanche Peak.

15.  Comanche Peak relies on suppliers like Quasar to supply a steady stream of the raw materials, such as $U_3O_8$, that it needs to run its power plants.

16.  On November 10, 2017, Plaintiff Comanche Peak and Defendant Quasar negotiated a Brokered Transaction via a third-party broker in which Quasar agreed to sell a specific quantify of $U_3O_8$, 100,000 pounds, at a specific price, $23.15 per pound, to Comanche Peak for a total of $2,315,000 (the "Agreement").

17.  However, while parties to such a transaction might consider entering into a spot agreement, the parties here expanded their discussions to a broader scope and agreed that they would enter into a master sales agreement ("MSA") which would allow them to do more business in the future to buy/sell additional quantities of $U_3O_8$.

18.  Comanche Peak and Quasar then began documenting the MSA that contained not only the agreed-on key terms as those recited in the brokered trade confirmation of quantity and price, but also other issues such as delivery, taxes, buyer/seller obligations etc., that parties may optionally include but are not necessarily required.

19.  Between December of 2017 and October of 2018, Comanche Peak relied on Quasar's promises—and repeated reassurances—that it had an agreement to receive 100,000 pounds of $U_3O_8$ at a price of $23.15 per pound, and engaged in

meaningful good faith negotiations with Quasar over the MSA, and did not press to finalize the Agreement.

20. At all relevant times, Quasar repeatedly assured Comanche Peak and made affirmative representations that a finalized version of the MSA was forthcoming and that it had Comanche Peak's $U_3O_8$ ready for shipment.

21. At all relevant times, Quasar made affirmative representations that the Agreement was still in force, and never stated that it was contingent on the MSA—i.e., Comanche Peak was never led to believe that absent an executed MSA, the Agreement could not be consummated or could be re-traded from the written material terms of the brokered trade confirmation.

22. By October 2018, the MSA was complete and ready for both parties' execution.

23. However, after almost a year of back and forth negotiations (largely due to Quasar's delay and lag in revising drafts of the MSA that went between the two parties), Quasar suddenly notified Comanche Peak verbally that it did not intend to sign the MSA because the price of $U_3O_8$ had fluctuated to the point that the Agreement was no longer favorable to Quasar.

24. The price had at different times been to Comanche Peak's disadvantage, yet it did not terminate the MSA because the parties had reached agreement on the material terms.

25. Indeed, in the months between the brokered trade confirmation and Comanche Peak's execution of the MSA the market price of $U_3O_8$ had fallen from the agreed-upon price of $23.13, to $22.65. It would have been to Comanche Peak's benefit to abandon the Agreement and make lower-priced purchases. But Comanche Peak did not do so because all of the parties' communications affirmed the existence of a final, enforceable contract.

26. Thus, Comanche Peak materially changed its position in reliance on the promises made by the Defendant.

27.     Indeed, Comanche Peak rightly believed that it was bound by the Agreement with Quasar, and thus, did not back out (or even attempt to back out) to take advantage of the more favorable market price by re-trading the deal with Quasar or seeking out a better deal with a different counter-party—it understood that it was already legally bound by its enforceable Agreement with Quasar.

28.     This change in price is reflected in the following graphic:



Source: https://www.cameco.com/invest/markets/uranium-price

29.     When Quasar saw that the price had gone up several dollars, it abandoned the contract in bad faith and repudiated it (or attempted to).

30.     Comanche Peak rejected Quasar's attempt to unilaterally terminate the Agreement and sent over the executed MSA.

31.     Due to its reliance on the Agreement, the negotiations of the Master Sales Agreement, and Quasar's repeated assurances that it intended to honor the Agreement, Comanche Peak had not previously sought to obtain $U_3O_8$ from alternate sources at more favorable prices.

32. Quasar's timing of its termination coincided with a rise in market price that inflicted the greatest amount of damage on Comanche Peak.

33. Comanche Peak has been damaged by Quasar's actions.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Breach of Contract / Promissory Estoppel

34. The foregoing factual allegations are incorporated by reference as if fully set forth herein.

35. Plaintiff had an Agreement with Defendant for the purchase and sale of 100,000 pounds of $U_3O_8$ uranium for $23.15 per pound.

36. Defendant's agents specifically promised in writing that delivery would be made on the terms already set forth.

37. The parties' Agreement meets all the required criteria for a contract under the Uniform Commercial Code.

38. While the parties embarked on negotiating an MSA, that did not vitiate or replace the Agreement already reached.

39. Plaintiff materially changed its position in reliance on Defendant's representations and omissions which at all relevant times evinced Defendant's promise and reassurance that it would honor the Agreement.

40. Defendant's reassurances followed by its sudden repudiation operate as a waiver of any condition precedent to consummating the Agreement other than tender of payment.

41. Defendant's repudiation of the Agreement and/or refusal to sign the MSA is thus a breach of contract.

42. Defendant is estopped from denying the enforceability of the Agreement as a contract under both New York and/or California law.

43. Defendant's refusal to honor its Agreement has caused Plaintiff damages.

44. Plaintiff is thus entitled to damages under a traditional breach of contract theory and/or under the Restatement 2d of Contracts § 90 (promissory estoppel) (adopted under New York and California law).

## SECOND CAUSE OF ACTION
## Breach of Duty of Good Faith

45. The foregoing factual allegations are incorporated by reference as if fully set forth herein.

46. Plaintiff had an Agreement with Defendant for the purchase and sale of 100,000 pounds of $U_3O_8$ uranium for $23.15 per pound.

47. Defendant's denying the enforceability of the Agreement and/or the MSA is a breach of the duty of good faith and fair dealing implied in every transaction under New York and/or California law.

48. Plaintiff is thus entitled to damages caused by the breach of the duty of good faith and fair dealing.

## THIRD CAUSE OF ACTION
## Negligent Misrepresentation

49. The foregoing allegations are incorporated by reference as if fully set forth herein.

50. Defendant repeatedly represented that it intended to move forward with the Agreement and did not condition same solely on completion and execution of the MSA.

51. Defendant's agents specifically promised in writing that delivery would be made on the terms already set forth.

52. Defendant made no mention of the fact that, and omitted that, it had changed such an intent.

53. Defendant's misrepresentations and omissions were at best the result of negligence and failure to apprise Plaintiff of the truth which was that Quasar intended to repudiate the agreement.

54. Plaintiff has been damaged by the negligent misrepresentations and omissions.

#### FOURTH CAUSE OF ACTION
#### Unjust Enrichment

55. The foregoing factual allegations are incorporated by reference as if fully set forth herein.

56. The foregoing factual allegations set forth the basis for Plaintiff's claim that Defendant's actions are inequitable such that it would be unjust to permit Defendant to retain the benefit of its inequitable conduct.

57. Plaintiff alleges in the alternative that in the event no contract is found, it would be unjust for Defendant to retain the benefits of its actions and omissions, and Plaintiff should be awarded same to avoid unjust enrichment.

### VI.

### PRAYER FOR RELIEF

58. Plaintiff requests relief in the form of a judgment for damages, attorneys' fees, restitution, disgorgement, and any other relief to which it justly entitled.

### VII.

### TRIAL BY JURY REQUESTED

59. Plaintiff requests trial by jury on all matters and issues triable to a jury under applicable law.

| | | |
|---|---|---|
| 1 | Dated: September 3, 2020 | Respectfully submitted, |
| 2 | | |
| 3 | | **SBAITI & COMPANY PLLC** |
| 4 | | */s/ Mazin A. Sbaiti* |
| 5 | | Mazin A. Sbaiti<br>CA Bar No. 275089 |
| 6 | | mas@sbaitilaw.com |
| 7 | | J.P. Morgan Chase Tower<br>2200 Ross Avenue – Suite 4900W |
| 8 | | Dallas, TX  75201 |
| 9 | | T:  (214) 432-2899<br>F:  (214) 853-4367 |
| 10 | | |
| 11 | | **Counsel for Plaintiff** |