UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMANCHE PEAK POWER COMPANY LLC,<br><br>Plaintiff,<br><br>v.<br><br>QUASAR RESOURCES PTY LTD,<br><br>Defendant. | Case No.: 20-cv-1731-GPC-LL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>[ECF No. 4] |

Before this Court is Defendant's Motion to Dismiss Complaint ("MTD") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)"). ECF No. 4. Upon considering the moving papers, response and reply, the Court **GRANTS IN PART and DENIES IN PART** Defendant's Motion, with leave for Plaintiff to amend the Complaint.

I.   **BACKGROUND**

Plaintiff is a nuclear energy facility. Compl. ¶ 2, ECF No. 1. It purchases uranium, a commodity, which is enriched and then used in the energy generating process. *Id.* Defendant sells Triuranium Octoxide ("$U_3O_8$"), which is a compound of uranium that

is used in the nuclear fuel cycle. *See id.* ¶ 14. Thus, according to Plaintiff, it relies on suppliers like Defendant "to supply a steady stream of the raw materials, such as $U_3O_8$, that it needs to run its power plants." *Id.* ¶ 15.

Plaintiff alleges that on November 10, 2017, the parties entered into a "Brokered Transaction." *Id.* ¶ 16. The crux of the dispute is whether the parties entered an "agreement" that is binding and therefore enforceable. *Compare id.* ¶ 16 ("Agreement"), *with* Def.'s MTD Mem. 1, ECF No. 4-1 ("agreement to agree").

What both parties do agree upon is that certain emails were circulated. The emails are offered by Defendant in a Request for Judicial Notice ("RJN").[1] The details of the emails are as follows. On Friday, November 10, 2017, a third-party broker sent an email to the representative of Defendant. It has the subject line "-EXT-Confirm- Quasar/ Comanche Mar'18 CVD," and its body includes the caption "Uranium Confirm." RJN Ex. 1, ECF No. 4-2. The email identifies the "Buyer" and "Seller" as Plaintiff and Defendant, respectively. The email also includes a line, which states, "Special Conditions: Subject to credit and mutually agreeable contracts." *Id.* The email identifies the "Product" as $U_3O_8$, the "Quantity" of 100,000 lbs and "Price" of $23.15/lb, and the "Delivery Date" as March 1, 2018. *Id.* Further, the bottom of the email includes certain terms of the Brokered Transaction, such as "Obligations." At the end of the terms includes an "Important Notice," which states the following:

> If this confirmation contains any terms or conditions which are contrary to your (meaning either the "Buyer's" or the "Seller's") understanding of the Transaction ("Discrepancies"), you must notify us [the third-party broker] of the Discrepancies before the close of business (meaning "5:00 p.m. CPT") on the first business day after you receive or have electronic access to this.

---

[1] The Court grants Defendant's RJN, ECF No. 4-2, in which Plaintiff concurs, Pl.'s Resp. 4, ECF No. 10. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1080 n.1 (9th Cir. 1995)).

> If you do not notify us of any Discrepancies before the deadline described in the preceding sentence, you will be deemed to have agreed to the terms and conditions of the Transaction set forth in this confirmation.

*Id.* And on Monday, November 13, 2017, Plaintiff forwarded the same November 10, 2017 email to Defendant. *See* RJN Ex. 2, ECF No. 4-2.

According to Plaintiff, the parties "expanded their discussions to a broader scope and agreed that they would enter into a master sales agreement ('MSA'),'" which is in contrast to a "spot agreement." Compl. ¶ 17, ECF No. 1 (emphasis removed). Further, between December 2017 and October 2018 the parties "began documenting the MSA." *Id.* ¶ 19. And during the relevant times, Defendant allegedly "made affirmative representations" that both (1) a finalized version of the MSA is forthcoming, and (2) the Brokered Transaction referenced above was still in force "and never stated that it was contingent on the MSA." *Id.* ¶¶ 20, 21. Plaintiff asserts that it "relied" on Defendant's "promises" and "repeated reassurances" that an agreement existed to receive 100,000 pounds of $U_3O_8$ at the price of $23.15 per pound, "and did not press to finalize the Agreement [which is defined in the Complaint as the Brokered Transaction referenced above]." *See id.* ¶¶ 16, 19. Relatedly, Plaintiff represents that due to such reliance, it did not seek to obtain $U_3O_8$ from other sources at more favorable prices. *Id.* ¶ 31.

Ultimately, Defendant informed Plaintiff that it would not sign the MSA, even though Plaintiff's Complaint alleges "the MSA was complete and ready for both parties' execution" by October 2018. *See id.* ¶¶ 22, 23. And because Plaintiff was not seeking its supply from other sources, Plaintiff claims it was damaged by Defendant's actions, for the timing of the termination coincided with a rise in the market price of $U_3O_8$. *See id.* ¶¶ 31–33.

The Complaint alleges four causes of action: (1) breach of contract and/or promissory estoppel; (2) breach of duty of good faith and fair dealing; (3) negligent

misrepresentation; and (4) unjust enrichment. *Id.* at 7–9.  Defendant seeks to dismiss all of them.  MTD, ECF No. 4.  Plaintiff filed a Response, ECF No. 10, and Defendant filed a Reply, ECF No. 11.

## II.   LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint, *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001), and dismissal is warranted if the complaint lacks a cognizable legal theory, *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).  A complaint may also be dismissed if it presents a cognizable legal theory yet fails to plead essential facts under that theory. *Id.*  While a plaintiff need not give "detailed factual allegations," a plaintiff must plead sufficient facts that, if true, "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 547).  A claim is facially plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  In other words, "the nonconclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Service,* 572 F.3d 962, 969 (9th Cir. 2009).  Determining the plausibility of the claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

In reviewing a Rule 12(b)(6) motion to dismiss, the court assumes the truth of all factual allegations and construes all inferences from them in the light most favorable to the non-moving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).  At the same time, legal conclusions need not be taken as true merely because they are in the

form of factual allegations.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003).

When ruling on the motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice.  *Lee v. Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).

### III. DISCUSSION

The critical question posed is whether the "Brokered Transaction" discussed *supra* pages 2–3 of this Order qualifies as a contract.  Applying the Rule 12(b)(6) legal standard that all factual allegations are construed in the light most favorable to the non-moving party, the Court concludes that a contract has been plausibly alleged.  Since a contract (and thus by extension a promise) existed, the claims grounded in promissory estoppel and the implied covenant of good faith and fair dealing also survive Defendant's MTD.  Plaintiff's claim of negligent misrepresentation also remains in play because the misrepresentations extend beyond the Brokered Transaction to the Defendant's conduct when negotiating the MSA.  However, Plaintiff's claim of unjust enrichment is not a valid cause of action under California law and Plaintiff's pleading fails to plausibly allege a quasi-contract claim based upon unjust enrichment.  Therefore, Plaintiff's Fourth Cause of Action is **DISMISSED without prejudice**, with an opportunity for Plaintiff to amend its Complaint.

#### A. Existence of a Contract

Defendant seeks to dismiss the First Cause of Action, the breach of contract claim. Ultimately Plaintiff must prove the following elements: (1) existence of a contract; (2) plaintiff's performance (or excuse for non-performance); (3) the breach; and (4) damages (with the implicit element that the breach caused the plaintiff's damage).  *See Agam v. Gavra*, 236 Cal. App. 4th 91, 104 (2015) (citations omitted).  Defendant's MTD is based on the first element, whether a contract actually existed.

The thrust of Defendant's argument stems from the following language in the Brokered Transaction: "Special Conditions: Subject to credit and mutually agreeable contracts."  *See* Def.'s MTD Mem. 5, ECF No. 4-1; RJN Ex. 1, ECF No. 4-2.  And because the parties "unequivocally chose not to bind themselves until a subsequent agreement was made," Defendant argues that at best there was only an "agreement to agree," not an enforceable contract.  Def.'s MTD Mem. 6, ECF No. 4-1.

Yet these Special Conditions do not foreclose a finding that a contract was entered into between the parties.  Assuming Plaintiff's allegations are true and construing all inferences favorable to Plaintiff, the Brokered Transaction proves the existence of an independent "spot contract," and the Special Conditions recognize ways to avoid or modify the confirmed terms.  *See* Pl.'s Resp. 5, ECF No. 10; Compl. ¶ 17, ECF No. 1.  In other words, a series of "mutually agreeable contracts" may be entered which would modify the original spot contract, but this recognition does not obviate the original contract itself.

There are two textual bases for this reading.  First, the Special Conditions specifies "mutually agreeable contracts" in the plural form and not in the singular form.  Defendant submits that "The parties unequivocally chose not to bind themselves until *a* subsequent agreement was made." Def.'s MTD Mem. 6, ECF No. 4-1 (emphasis added).  This places Defendant's stated position in tension with the idea that "mutually agreeable contracts" are required to formulate a contract.  The only way to avoid the conflict at this time is to understand "mutually agreeable contracts" as meaning any subsequent modifications.

Second, the bottom of the Brokered Transaction email includes an "Important Notice" section.  This section states that parties to the Transaction must notify the broker of any discrepancies by the first business day after receipt of the email, or else the parties "will be deemed to have agreed to the terms and conditions of the Transaction."  RJN Ex.

1 at 2, ECF No. 4-2. The terms and conditions include the operative quantity and price of $U_3O_8$, and an agreement that "the Parties are solely responsible for performing their respective Obligations." *See id.* The Important Notice—especially its requirement to inform the broker within one business day of any discrepancies—supports Plaintiff's position that the Brokered Transaction produced an agreement that binds both parties.

According to Defendant, the Important Notice section merely affirms that Defendant agreed to the Special Conditions section; Defendant did not need to notify any discrepancies because Defendant concurred there was only an agreement to agree. *See* Def.'s Reply 2–3, ECF No. 11. But this circular argument is one that the Court is not required to accept on a motion to dismiss.

Furthermore, under the canon to read the terms "as a whole," *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000); *accord Iqbal v. Ziadeh*, 10 Cal. App. 5th 1, 10–11 (2017), the Court does not find a reason to prioritize the Special Conditions section over the "Obligations" that the Brokered Transaction provides. *See Gray1 CPB, LLC v. Kolokotronis*, 202 Cal. App. 4th 480, 487 (2011) ("The Court has a duty to construe every provision of a written instrument as to give force and effect, not only to every clause but to every word in it, so that no clause or word may become redundant."); *Smissaert v. Chiodo*, 163 Cal. App. 2d 827, 830 (1958) (discussing the need for "a construction of the instrument taken as a whole").

Several sources and authorities further support Plaintiff's position at this stage of the lawsuit. First, California's Uniform Commercial Code (the "California UCC") states that there must be "some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker." Cal. Com. Code § 2201(1). Leaving one or more terms open does not invalidate the contract. *See id.* § 2204(3). And if the writing

in confirmation of the contract is in receipt and the recipient does not object to its contents within 10 days, the underlying contract is still enforceable. *Id.* § 2201(2).

Here, the email of the Brokered Transaction is the writing that plausibly confirms the contract's existence, which Defendant did not protest within 10 days. While Defendant argues that the writing is not "signed by both parties," Def.'s Reply 3, ECF No. 11, Defendant is ignoring the statutory language which states that the writing signed by its "authorized agent or broker" satisfies Section 2201(1)'s conditions as well. *Compare* RJN Ex. 1 at 2 (email signature by broker), ECF No. 4-2, *with Ruiz v. Moss Bros. Auto Grp.*, 232 Cal. App. 4th 836, 843 (2014) (quoting Cal. Civ. Code § 1633.7(a)) ("A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.").

Second, the facts presented in Defendant's case law illustrate the kinds of vocabulary that courts are looking for to conclude that a written instrument is merely an agreement to agree. The Brokered Transaction in the instant dispute wholly lacks such express manifestation that there must be an actual contract to follow. For example, in *Rennick v. O.P.T.I.O.N. Care, Inc.*, the letter of intent expressly stated that it "is of no binding effect," that its purpose "is to acknowledge the [parties'] respective intentions," and that it is "directed toward the creation of a binding interim agreement and other contracts." 77 F.3d 309, 314–16 (9th Cir. 1996) (emphases removed). In *Beck v. Am. Health Grp. Internat., Inc.*, the court flagged the following languages: (1) "It is a pleasure to draft the outline of our future agreement"; (2) after a "general understanding," the party may "forward it to Corporate Counsel for the drafting of a contract"; and (3) "When we have a draft, we will discuss it, and hopefully shall have a completed contract." 211 Cal. App. 3d 1555, 1562–63 (1989). And *Smissaert v. Chiodo* took issue with the following provision: "the *validity* of said *proposed* agreement is subject and conditioned upon the parties *agreeing upon and reducing to writing all terms and conditions*

*necessary and incidental* to the *validity* of said *proposed* agreement." 163 Cal. App. 2d 827, 831–32 (1958) (emphases in original).  Even the New York case law cited by Defendant involved a letter of intent with the following language: "All terms and conditions referenced herein are non-binding and subject to [p]urchaser's satisfactory due diligence review . . . and negotiation of a mutually agreed upon Loan Sale Agreement." *DCR Mortg. VI Sub I, LLC v. Peoples United Fin., Inc.*, 50 N.Y.S.3d 144, 146 (2017) (first alteration in original).  These expressions are far more conspicuous and substantive than the one-line passage that Defendant relies on.

  Third and finally, the legal standard for a Rule 12(b)(6) motion simply favors Plaintiff's construction of the events.  Defendant has not met its burden on a motion to dismiss.  Plaintiff alleges that the practice of entering a spot agreement first and then formulating a master sales agreement later is industry custom.  *See, e.g.*, Compl. ¶ 17, ECF No. 1; Pl.'s Resp. 5, ECF No. 10.  Plaintiff further alleges that throughout the negotiation of the MSA, Defendant represented that the initial Brokered Transaction was still a valid contract.  *See* Compl. ¶¶ 19–21, ECF No. 1.

  While Defendant views things differently, Defendant's version of the narrative alone does not sway the Court.  For example, Defendant argues that the year-long negotiation process evinces no meeting of the minds.  *See* Def.'s Reply 6–7, ECF No. 11.  But disagreement over the MSA does not necessarily invalidate the existence of a pre-existing agreement, one backed by the Brokered Transaction.  In addition, Defendant refers to a passage in Plaintiff's Response, "the parties mutually agreed to waive the usual spot-agreement."  Def.'s Reply 5, ECF No. 11 (quoting Pl.'s Resp. 10, ECF No. 10).  This is taking the passage out of context, for Plaintiff's Complaint is not that the "waiver" vacated the original agreement, but that the MSA would substantiate the agreement already in place.  *See* Compl. 4–5, ECF No. 1; Pl.'s Resp. 10, ECF No. 10.  A better understanding of these events will emerge after discovery, but vagueness favors the

non-movant (Plaintiff) at the motion to dismiss stage.

In conclusion, based on the legal standard of Rule 12(b)(6), the breach of contract claim survives the MTD. The Special Conditions do not swallow the other parts of the Brokered Transaction. These other parts lead the Court to conclude that the parties at least agreed to a one-time transaction, with the recognition that the MSA will extend the parties' contractual relationship for a longer term. The California UCC provisions and the case law cited by Defendant demonstrate that much more is needed for the Court to deem that Defendant met its burden of proof to dismiss the First Cause of Action.

### B.   Promissory Estoppel and Implied Covenant

With the Court concluding that the November 10, 2017 Brokered Transaction plausibly evinces a contract, Defendant's attempt to dismiss the claims based upon promissory estoppel and implied covenant of good faith and fair dealing also fails.

The Court quickly addresses the latter cause of action first. A claim of implied covenant of good faith and fair dealing requires an enforceable contract. *See, e.g.*, *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1393 (1990), *as modified on denial of reh'g* (Oct. 31, 2001); *Beck*, 211 Cal. App. 3d at 1563 (citations omitted). And since the sole basis for Defendant's motion to dismiss this claim is that there is no contract, *see, e.g.*, Def.'s MTD Mem. 8–9, ECF No. 4-1, the Court's conclusion to the contrary resolves this matter.

As for a valid promissory estoppel claim, there must be: "(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." *Aceves v. U.S. Bank, N.A.*, 192 Cal. App. 4th 218, 225 (2011) (quoting *Advanced Choices, Inc. v. State Dept. of Health Services*, 182 Cal. App. 4th 1661, 1672 (2010)), *as modified* (Feb. 9, 2011). Of course, the "promise" is the "indispensable element" in the claim. *Id.* at 226. And as discussed in the elements,

this promise must be "clear and unambiguous in its terms." *Id.* (quoting *Garcia v. World Sav., FSB*, 183 Cal. App. 4th 1031, 1044 (2010)).  Defendant argues that there was no clear and unambiguous promise, only a conditional promise at best as shown by the Special Conditions.[2]

To start, "[t]hat a promise is conditional does not render it unenforceable or ambiguous." *Id.* (alteration in original) (quoting *Garcia*, 183 Cal. App. 4th at 1045). Instead, the "condition" makes a promise ambiguous if the condition evinces an agreement to agree instead of an agreement. *Compare id.* (finding defendant's agreement to work with plaintiff on mortgage refinancing "if she no longer pursued relief in the bankruptcy court" to constitute a "clear and unambiguous promise"), *with Rennick*, 77 F.3d at 317 (discussing the nonbinding language of the letter of intent, distinguished *supra* pages 8–9 of this Order), *and R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 79 (2d Cir. 1984) (discussing that the history of the negotiations made it plain that the promise or agreement were "conditional upon the signing of a written contract"), *and Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 265 (2d Cir. 1984) ("[T]he draft agreements made it clear that the obligations . . . were contingent upon execution and delivery of the formal contract documents.").

Section II.A of this Order, *supra*, explained why the Special Conditions did not transform the Brokered Transaction into an agreement to agree. Thus, to the extent that the entirety of Defendant's argument hinges on the Special Conditions language, Defendant's attempt to dismiss the promissory estoppel claim also fails. At this stage of

---

[2] Defendant also argues that breach of contract and promissory estoppel are generally inconsistent remedies. Def.'s MTD Mem. 4, ECF No. 4-1.  While this is true, Plaintiff is pleading a claim in the alternative. *See Fleet v. Bank of Am. N.A.*, 229 Cal. App. 4th 1403, 1413 (2014).  The Court rejects Defendant's conclusory remark that "Plaintiff has not done so here," Def.'s MTD Mem. 4, ECF No. 4-1, as the Complaint shows otherwise.

the lawsuit, there was a "clear and unambiguous promise" that Defendant would deliver 100,000 lbs of $U_3O_8$, at the price of $23.15/lb. *See* RJN Ex. 1, ECF No. 4-2. And while the Brokered Transaction states that the transaction is "Subject to credit and mutually agreeable contracts," this provision is more properly read as an agreement that future modifications (such as an MSA) could occur, not a preceding requirement to the Brokered Transaction.

### C. Negligent Misrepresentation

The MTD also seeks to dismiss Plaintiff's Third Cause of Action, negligent misrepresentation. "The elements of negligent misrepresentation are (1) a misrepresentation of a past or existing material fact, (2) made without reasonable ground for believing it to be true, (3) made with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *Bock v. Hansen*, 225 Cal. App. 4th 215, 231 (2014) (quoting *Ragland v. U.S. Bank National Assn.*, 209 Cal. App. 4th 182, 196 (2012)).

Defendant presents two arguments as to why the Court should dismiss Plaintiff's negligent misrepresentation claim. First, Defendant presents the economic loss rule: "[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law." *Darbeevision, Inc. v. C&A Mktg., Inc.*, No. SACV1800725AGSSX, 2018 WL 5880618, at *2 (C.D. Cal. Aug. 30, 2018) (alteration in original) (quoting *Elrich v. Menezes*, 21 Cal. 4th 543, 551 (1999)); *cf. Body Jewelz, Inc. v. Valley Forge Ins. Co.*, 241 F. Supp. 3d 1084, 1092 (C.D. Cal. 2017) ("The practical effect of this rule is that claims for negligence involving only economic loss are generally dismissed in favor of breach of contract claims."). And under the economic loss rule, Defendant argues that Plaintiff is repackaging its contract claim to a tort claim, essentially double-dipping on liability.

/ / /

The Court does not find that the economic loss rule supports dismissal of the Third Cause of action because the Complaint raises two separate interactions between Plaintiff and Defendant.  One is the Brokered Transaction that Defendant has reneged, but the other is the MSA negotiation process which ultimately did not come into fruition.[3]  *See* Compl. 4–9, ECF No. 1.  While the economic loss rule might eliminate any negligent misrepresentation liability stemming from the Brokered Transaction, it leaves intact the allegations of Defendant's conduct during the MSA negotiations.

Second, Defendant argues Plaintiff could not prove "justifiable reliance."  This argument is based on the fact that the Brokered Transaction specified the Special Conditions.  But the Court already discussed how Defendant's understanding of the Special Conditions' implications is unpersuasive.  Accordingly, Defendant's extension of its theory to the justifiable reliance issue also fails.  Further, Defendant's argument does not address the other part of Plaintiff's negligent misrepresentation liability—that Plaintiff relied on Defendant's "affirmative representations that a finalized version of the MSA was forthcoming," Compl. ¶ 20, and as a result "had not previously sought to obtain $U_3O_8$ from alternate sources at more favorable places," *id.* ¶ 31.  Assuming the truth of Plaintiff's factual allegations and drawing inferences favorable to Plaintiff, the negligent misrepresentation cause of action also survives the motion to dismiss.

---

[3] The Complaint is not as clear on the matter as it could be.  Paragraphs 50 to 53 of the Complaint are limited to the unfulfilled Brokered Transaction.  *See* ECF No. 1. However, the Complaint describes what occurred during the MSA negotiation process, and Plaintiff alleges that "in reliance on the promises made by the Defendant" (which includes the assurance "that a finalized version of the MSA was forthcoming"), Plaintiff did not seek out alternative sources for $U_3O_8$.  And because the MSA was not finalized, Plaintiff incurred damages.  *See id.* at 5–7.  Since the Third Cause of Action also incorporates all "foregoing allegations," *id.* ¶ 49, the Court treats the Third Cause of Action as implicating the two separate interactions.

### D. Unjust Enrichment

Finally, Defendant seeks to dismiss Plaintiff's Fourth Cause of Action, unjust enrichment. "[T]here is no cause of action in California for unjust enrichment." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010) (alteration in original) (quoting *Melchior v. New Line Productions*, Inc. 106 Cal. App. 4th 779, 793 (2003)); *accord Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015); *Azco Biotech, Inc. v. Qiagen, N.V.*, No. 12-CV-2599-BEN (DHB), 2015 WL 12516024, at *9 (S.D. Cal. July 2, 2015) ("The Court need not address arguments for a claim that California does not recognize."). Plaintiff is silent on this issue except for a passing reference in the introduction section—unsupported by any case law—that courts may construe the claim as a "quasi-contract." *See* Pl.'s Resp. 3, ECF No. 10.

The Court acknowledges that this alone does not end the matter. Because unjust enrichment is not a theory of recovery but an effect, the Court instead inquires whether restitution is appropriate. *See Durell*, 183 Cal. App. 4th at 1370 ("Unjust enrichment is synonymous with restitution."); *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004). And when doing so, courts analyze whether defendant "unjustly conferred a benefit 'through mistake, fraud, coercion, or request,'" in which "[t]he return of that benefit is the remedy 'typically sought in a quasi-contract cause of action.'" *Astiana*, 783 F.3d at 762 (quoting 55 Cal. Jur. 3d Restitution § 2). For example, if a defendant obtained a benefit from the plaintiff by illegal conduct, the plaintiff may choose not to sue in tort but instead under a "quasi-contract theory." *Durell*, 183 Cal. App. 4th at 1370; *cf. Astiana*, 783 F.3d at 762 (reversing the district court's dismissal of plaintiffs' quasi-contract cause of action, in which plaintiffs alleged that defendant was "unjustly enriched" from false advertising).

But even under this inquiry, the Complaint fails to meet the adequate pleading standards for the Court to conclude that restitution under a quasi-contract theory is

appropriate.  No part of Plaintiff's documents (either the Complaint or Response) explains how the fact patterns in this lawsuit fit into the permissible scenarios for restitution, such as Defendant receiving benefit by fraud or other unjust means.  At best, Plaintiff alleges that the facts "set forth the basis for Plaintiff's claim that Defendant's actions are inequitable such that it would be unjust to permit Defendant to retain the benefit or its inequitable conduct."  Compl. ¶ 56, ECF No. 1.  But descriptions such as "inequitable" and "unjust" are merely legal conclusions that the Court does not consider, even at the motion to dismiss stage.  *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 547).  And to the extent that Plaintiff is silent in its Response brief and fails to draw any connection between Defendant's conduct and grounds for restitution, the Court concludes that Plaintiff's pleading is deficient on this cause of action.

### E.     Leave to Amend

While the Court has identified the Complaint's defects above and dismissed the Fourth Cause of Action based on the defects, the Court finds that an amendment could possibly cure the defects.  Therefore, granting leave to amend is appropriate.  *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000); *cf.* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").

## IV.    CONCLUSION

Based on the foregoing reasons, Defendant's Motion to Dismiss Complaint is **GRANTED IN PART and DENIED IN PART**.  Specifically, Plaintiff's Fourth Cause of Action, Unjust Enrichment, is **DISMISSED without prejudice**.  Plaintiff may file an amended complaint which addresses any of the deficiencies identified above within <u>thirty (30) days</u> of the filing of this Order.

**IT IS SO ORDERED.**

Dated:  April 22, 2021

Hon. Gonzalo P. Curiel
United States District Judge